## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **PROGRESSIVE GARDEN STATE INSURANCE COMPANY,**<br><br>**Plaintiff,**<br><br>v.<br><br>**ERWIN METIUS,**<br><br>**Defendant.** | Civ. No. 18-2893 (WJM)<br><br><br>**OPINION** |

## WILLIAM J. MARTINI, U.S.D.J.

Plaintiff Progressive Garden State Insurance Company ("Progressive") brings this declaratory judgment action against its insured, Defendant Erwin Metius ("Metius"), seeking a declaration of non-coverage under a New Jersey Boat and Personal Watercraft Policy. This matter is now before the Court on Progressive's motion for summary judgment. ECF No. 49. Having reviewed all submissions made in support of and in opposition to the motion, the Court decides the motion on the papers and without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated herein, Progressive's motion for summary judgment is **GRANTED**.

### I.      JURISDICTION

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333. The claim concerns a marine insurance contract and therefore falls within the Court's admiralty jurisdiction. *See N. Am. Specialty Ins. Co. v. DiAntonio*, No. 14-4019, 2015 WL 790514, at *1 (D.N.J. Feb. 25, 2015) (exercising subject matter jurisdiction over a declaratory judgment action pursuant to § 1333 where the case arose out of a charter vessel insurance policy).

### II.     FACTUAL BACKGROUND [1]

---

[1] The facts recounted are undisputed unless noted otherwise. The Court shall cite to Progressive's Statement of Material Facts, ECF No. 49-11, as "Pl. SOMF"; to Metius's Response thereto, ECF No. 51, as "Def. Resp. to Pl. SOMF"; and to Metius's Supplemental Statement of Material Facts, ECF No. 51, as "Def. SOMF." To the extent that either party responds to one another's Statements of Material Facts by disputing facts on the basis that "the document speaks for itself," *see, e.g.,* Def. Resp. to Pl. SOMF ¶¶ 13-15, 17, 19, 20, 25, 27-30, 32, 36, 38, the Court finds such a response, without more, does not give rise to a genuine

### A. The Boat Purchase

In August of 2016, Metius and his wife separated and he moved out of their jointly owned home in Jersey City, New Jersey, changed his mailing address to that of their jointly owned second home in Blairstown, New Jersey (the "Blairstown Address"), and stayed with family and friends until he rented an apartment of his own in Jersey City. Pl. SOMF ¶¶ 4-6, 9. The apartment was a five- to ten-minute commute from his office at 430 Communipaw Avenue in Jersey City (the "Office Address"), where he served as the President and CEO of his company, EAM Distribution. *Id.* ¶ 2; Metius Dep. Tr. 29:9-29:11.

In January of 2017, Metius and his girlfriend, Kim Latour ("Ms. Latour"), began looking for a boat to purchase, one that Metius "could live on or stay on overnight" that was "large enough to be comfortable on board" but "small enough to fit into the slips in Jersey marinas." Pl. SOMF ¶ 10; Metius Dep. Tr. 37:5-37:12. At his deposition, Metius agreed that he intended to keep the boat in Jersey City so it could be close to the office and "something [he] could live on in town." Metius Dep. Tr. 38:13-38:23.

In April of 2017, while still searching for a boat, Metius began negotiating with Hudson Point Marina (the "Marina") in Jersey City and its manager, Bruce Boyle ("Boyle"), to procure a boat slip. Pl. SOMF ¶ 12. Boyle provided him with a copy of the Hudson Point Dockage Agreement, paragraph 12 of which prohibited "live aboards." *Id.* ¶ 13. On April 21, 2017, Metius sent an email to Boyle stating, "[a]s mentioned it is my intention to live on the board throughout the year," and asking him to "remove the 'no live aboard' requirement from the Agreement." Pl. Ex. 4, ECF No. 49-5. Boyle agreed to do so. *Id.* At his deposition, Metius reiterated that "[i]t was my intention to use the boat as a base in Jersey City while I was—so I could avoid the commute from Blairstown," and that he "intended to stay on board the boat at times." Metius Dep. Tr. 42:16-42:18, 48:9-48:10.

In July of 2017, Metius finally purchased the 1988 Marine Trader motor yacht "Happy Hours" (the "Vessel"). Pl. SOMF ¶ 16; Metius Decl. Ex. E, ECF No. 50-13. He took possession of the Vessel in August of 2017 and terminated his Jersey City apartment lease that same month because, as he testified, "I had the boat. At that point I had purchased the boat." Pl. SOMF ¶ 16; Metius Dep. Tr. 29:19-29:22.

### B. The Insurance Policy

On August 22, 2017, Metius applied for and obtained a New Jersey Boat and Personal Watercraft Policy (Policy No. 16050154-0) (the "Policy") online through

---

factual dispute. *See Yeager v. Covenant Sec. Servs., Ltd.*, No. 15-6012, 2017 WL 2560340, at *1 n.1 (D.N.J. June 13, 2017) (citing L. Civ. R. 56.1). The Court therefore deems these facts to be undisputed for purposes of resolving the instant motion, *see id.*, and either relies upon the parties' respective Statements of Material Facts or cites to the record directly.

Progressive's website. Pl. SOMF ¶ 21. The application required him to identify the "Primary Use" of his Vessel from the following series of drop-down menu items: "Business/Commercial use," "Pleasure use exclusively," "Primary Residence," "Racing/Speed contests," or "Rented or leased to others." *Id.*; Stern Decl. ¶ 5, ECF No. 49-10. Metius selected "Pleasure use exclusively." Pl. SOMF ¶ 22. If he had selected any of the other options, Progressive would not bind insurance coverage. *Id.* ¶ 21. At the end of the application, Metius reviewed Progressive's "Outline of Coverage" and answered the "Boat Questionnaire," which, in pertinent part, asked him if the Vessel he sought coverage for was "used as a primary residence." *Id.* ¶ 23. Metius marked "No." *Id.* He electronically signed the application, verifying the truth of its contents, and, based upon his representations, Progressive issued the Policy beginning August 22, 2017. Ins. Application, ECF No. 1-3; Ins. Policy, ECF No. 1-2.

The Policy provided Metius up to $300,000 in liability coverage for "Liability to Others," including "Bodily Injury and Property Damage Liability," as well as for "Uninsured Boater," "Medical Payments," "Sign & Glide," and "Coastal Navigation." Pl. SOMF ¶ 25. The Policy did not provide, and Metius did not pay the premium for, any coverage for hull insurance, *i.e.*, comprehensive "Physical Damage Coverage." *Id.* ¶¶ 25, 28.

## C.  The Fire

Five months later, on the evening of December 28, 2017, Metius returned to the Vessel docked at her slip in the Marina and prepared to spend the night aboard. *Id.* ¶¶ 16, 33. He turned on the Vessel's reverse-cycle A/C unit and, for the first time since he purchased the Vessel, toggled its function to "HEAT," triggering what he believed was an electrical fire. *Id.* ¶ 33; Pl. Ex. 2, Dec. 29, 2017 Phone Tr. 10:14-10:20, ECF No. 49-3. The fire consumed the Vessel, burning it to the waterline, and ignited a boat in the neighboring slip, causing it to burn and sink. Pl. SOMF ¶ 33. There was further damage to the Marina dock, and the possibility of an oil spill. *Id.* ¶ 34.

## D.  The Insurance Claim

Metius filed an insurance claim with Progressive under his Policy, seeking to recover on the damages to his Vessel, damages to the neighboring boat, and environmental remediation.[2] *Id.* ¶¶ 24, 35; Denial Letter, ECF No. 1-4.

---

[2] According to the Complaint, Mitchell Turnbough ("Turnbough") owned the neighboring boat and made an insurance claim against Metius. Compl. ¶¶ 6, 23. Progressive formally denied Turnbough's claim on or about January 29, 2018, explaining Metius had no coverage for the loss and his Policy had been voided back to its inception. Claim Letter, ECF No. 1-6. Progressive initially named Turnbough as a Defendant in the present action, alleging he may have an interest in the outcome of this coverage dispute. Compl. ¶ 28. Progressive then voluntarily dismissed the action against him, without prejudice, before he was served. ECF No. 7.

As part of its investigation into the claim, Progressive spoke with Metius over the phone three times: on December 29, 2017, January 9, 2018, and January 17, 2018. *See* Pl. Ex. 2, Phone Trs., ECF No. 49-3. Each call was recorded for quality assurance with Metius's permission. Pl. SOMF ¶ 35. During these recorded phone calls, Metius made the following representations to Progressive concerning the use of his boat and his living situation:

- He purchased the Vessel "mostly as a liveaboard," to reside on the Vessel, and did live aboard it prior to the fire. *Id.* ¶ 36; Pl. Ex. 2, Dec. 29, 2017 Phone Tr. 6:1-6:3, 7:12-7:14, ECF No. 49-3; Pl. Ex. 2, Jan. 9, 2018 Phone Tr. 34:19-35:1, ECF No. 49-3;

- He purchased the Vessel after separating from his wife and "need[ing] to find somewhere else to live." Pl. Ex. 2, Jan. 9, 2018 Phone Tr. 56:15-56:20, ECF No. 49-3. Having had "boating experience" and "a lot of time on the water," he stated it seemed like a "cost effective . . . way to live." *Id.* 56:22-56:25;

- He took the Vessel out of its slip only once since he purchased it in August. Pl. SOMF ¶ 40;

- When asked where he was residing after the fire, he responded, "[a]t this moment, I don't have a home. Well [I] have a place that I don't—I have a second home, but I don't live there. I'm officially homeless at the moment." Pl. Ex. 2, Jan. 9, 2018 Phone Tr. 20:11-20:15, ECF No. 49-3. He further stated, "my boat and my home went down, so I'm living with family and friends. . . . I was referring to my boat as my home." *Id.* 20:17-20:21;

- When asked where he receives mail and bills, he responded, "I have a weekend home or a home in Blairstown, New Jersey. I don't receive—I don't have anything mailed there. Everything comes to my office [at 430 Communipaw]. I have a business and I just manage my bills and my affairs through my office here." *Id.* 37:24-38:7;

- He was not living at the Blairstown Address after the fire because it was an hour-and-a-half commute. *Id.* 38:10-38:15. He stated, "I go up on weekends and, you know. On occasion I might go up through the week, but for the most part I stay in town here (inaudible)." *Id.* 38:19-38:21; and

- When asked why he had indicated on his insurance application that he was using the Vessel for pleasure, as opposed to indicating that he would be living on it as a primary residence, Metius responded, "I'm not sure I understand the difference. The pleasure—it's a pleasure craft. I don't know that there was an option of a live-

4

aboard. Again, I don't quite understand the distinction." Pl. Ex. 2, Jan. 17, 2018 Phone Tr. 71:4-71:17, ECF No. 49-3.

Progressive determined from Metius's representations that he had purchased and insured the Vessel not for "Pleasure use exclusively" as he had indicated on his insurance application, but with the intention of using the Vessel as a primary residence, and was using it as such at the time of the loss, in violation of the Policy. Denial Letter, ECF No. 1-4. Progressive consequently denied coverage of his claim on January 29, 2018, voided the Policy back to its inception, and refunded him the premium he had paid. *Id.*; Rescission Notice, ECF No. 1-5.

In doing so, Progressive relied upon the Policy's Exclusion number 21, under "Part I—Liability to Others," which expressly provides:

> Coverage under this Part I, including our duty to defend, will not apply to any insured person for: . . . 21. bodily injury or property damage arising out of an accident while using a watercraft *as a primary or permanent residence*.

Pl. SOMF ¶ 27 (emphasis added). Progressive also relied upon the Policy's "Fraud or Misrepresentation provision," under "Part VIII—General Provisions," which states, in relevant part:

> This policy was issued in reliance upon the information provided on your insurance application. We will not provide coverage, and may void this policy, if you:
>
> 1. made incorrect statements or representations to us with regard to any material fact or circumstance;
> 2. concealed or misrepresented any material fact or circumstance; or
> 3. engaged in fraudulent conduct;
>
> at the time of application or at the time of renewal. This means that we will not be liable for any claims or damages that would otherwise be covered.

*Id.* ¶ 30. And finally, Progressive relied upon the general maritime law doctrine of *uberimmae fidei*, which requires the insured to disclose all material facts, and not misrepresent any material facts, that affect the insurer's risk. Denial Letter, ECF No. 1-4.

On January 31, 2018, Metius, through counsel, wrote to Progressive objecting to the coverage denial and policy rescission. Countercl. ¶ 28; Compl. ¶ 27. This litigation ensued. For purposes of clarity, those additional material facts revealed in discovery and concerning Metius's living arrangements are addressed in the Court's analysis below.

### III.    Procedural History

On February 28, 2018, Progressive filed the present action seeking a declaration that it has no obligation to provide Metius insurance coverage under the Policy due to the operation of the Policy's primary residence exclusion, the Policy's Fraud or Misrepresentation provision, and the doctrine of *uberimmae fidei. See generally*, Compl. Metius filed counterclaims in response, seeking a declaration that Progressive wrongfully denied coverage and rescinded the Policy, as well as seeking damages for breach of contract and breach of the implied covenant of good faith and fair dealing. *See generally*, Countercl. This matter is now before the Court on Progressive's motion for summary judgment, which is fully briefed and ripe for consideration. *See* ECF Nos. 49-12, 50, 53.

### IV.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (emphasis in original and internal quotation marks omitted). In other words, "unsupported assertions, speculation, or conclusory allegations" are insufficient to defeat a summary judgment motion. *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d. Cir. 2003). "[T]here must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

To that end, the Court's role at the summary judgment stage "is 'not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 249). In doing so, the Court construes all facts and inferences in the light most favorable to the non-moving party. *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

## V.    DISCUSSION

The fundamental issue in this matter is whether Metius used the Vessel as his primary residence during the Policy period.  Progressive contends it is clear Metius intended to live aboard the Vessel when he purchased it, and was living aboard it at the time of the fire, thereby using it as his home and primary residence in violation of the Policy. *See generally* Pl. Br., ECF No. 49-12.  But Metius maintains that the term "primary residence" is ambiguous within the Policy, and is being conflated with the colloquial meaning of terms like "liveaboard" and "home." *See generally*, Def. Opp'n Br., ECF No. 50.  Metius maintains that he always considered the Blairstown Address to be his primary residence, and only intended to sleep on the Vessel from time to time. *Id.* at 1-2, 7.

In addressing the parties' arguments, the Court's analysis necessarily proceeds in two steps.  The Court first endeavors to interpret the meaning of "primary residence," and then considers whether the material facts of this case establish circumstances that conform to that meaning.

### A. Meaning of "Primary Residence"

When interpreting the language of marine insurance policies, courts generally apply state law. *Centennial Ins. Co. v. Lithotech Sales, LLC*, 29 F. App'x 835, 836 (3d Cir. 2002). Under New Jersey law, the language of an insurance policy, like the language of any type of contract, is interpreted "according to its plain and ordinary meaning." *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) (citing *Ambrosio v. Affordable Auto Rental, Inc.*, 704 A.2d 572, 575 (N.J. 1998)).  The Court is bound to enforce clear, unambiguous policy terms as they are written, but any ambiguities in terms of coverage are generally resolved in favor of the insured. *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 288-89 (3d Cir. 2004).

As for exclusionary clauses within a policy, such clauses "are presumptively valid and are enforced if they are 'specific, plain, clear, prominent, and not contrary to public policy.'" *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010) (quoting *Princeton Ins. Co. v. Chunmuang*, 698 A.2d 9, 17 (N.J. 1997)).  "If the words used in an exclusionary clause are clear and unambiguous, 'a court should not engage in a strained construction to support the imposition of liability.'" *Id.* (quoting *Longobardi v. Chubb Ins. Co.*, 582 A.2d 1257, 1260 (N.J. 1990)).  Conversely, "if there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it." *Id.* at 997 (citing *Cobra Prods., Inc. v. Fed. Ins. Co.*, 722 A.2d 545 (N.J. Super. Ct. App. Div. 1998)).

Here, the Policy expressly states that "property damage arising out of an accident while using a watercraft as a primary . . . residence" is excluded from coverage. Pl. SOMF ¶ 27.  The Policy defines terms like "property damage" and "watercraft," but it does not

define the term "primary residence." *Id.* ¶ 31; Ins. Policy at 2-3, ECF No. 1-2. Progressive's Boat Insurance webpage offers only slightly more detail, indicating Progressive would not insure "Boats used as a primary residence (Live Aboards)." Def. Ex. C, Bates No. 375-76, ECF No. 52-1. The term live aboard is generally defined to mean "a person who lives on a boat" or "a boat suitable for a person to live on." *The Merriam–Webster Dictionary, Liveaboard,* http://www.merriamwebster.com/dictionary/ liveaboard (last visited Jan. 20, 2022).

It appears that New Jersey courts have not yet interpreted the term "primary residence" within the specific context of a marine insurance policy, where the insured is alleged to have used a watercraft as such. *See* Def. Opp'n Br. at 5, ECF No. 50. Nonetheless, this term is not a sophisticated one. Its meaning may be drawn from plain, unambiguous language. The word "primary" is generally defined to mean "most important," "main," "principal," or "of first rank, importance, or value." *The Merriam–Webster Dictionary, Primary,* http://www.merriamwebster.com/dictionary/primary (last visited Jan. 20, 2022); *see, e.g., Dooley v. CPR Restoration & Cleaning Servs. LLC,* 591 F. App'x 74, 76 (3d Cir. 2014) ("The term 'primary duty' is defined in [29 C.F.R. § 541.700(a)] as 'the *principal, main, major or most important* duty that the employee performs.'" (emphasis added)). The word "residence" is generally defined to mean "[t]he act or fact of living in a given place for some time," "[t]he place where one actually lives," "bodily presence as an inhabitant in a given place," or "a dwelling." *Black's Law Dictionary, Residence* (11th ed. 2019).

Indeed, the definition of "residence" is consistent with the manner in which courts distinguish between an individual's "residence" and an individual's "domicile." The former signifies an "objective physical presence," whereas the latter signifies "a true, fixed, and permanent home" "established by an objective physical presence . . . coupled with a subjective intention to remain there indefinitely." *Washington v. Hovensa LLC,* 652 F.3d 340, 344 (3d Cir. 2011); *Krivulka v. Lerner,* No. 20-09724, 2021 WL 3260851, at *6 (D.N.J. July 30, 2021) ("[A]n individual's residency is merely tantamount to the place where he maintains a 'bodily presence as an inhabitant,' whereas an individual's domicile requires a demonstration of his intent to make that state his true 'home.'"); *Santeez v. State Farm Ins. Co.,* 768 A.2d 269, 273 (N.J. Super. Ct. Law Div. 2000) ("Residence . . . though parallel in many respects to domicile, is something quite different in that the elements of permanency, continuity and kinship with the physical, cultural, social and political attributes which inhere in a 'home' according to our accepted understanding, are missing."). This explains why a person can have only one domicile, but can have multiple places of residence. *See Arents v. Gen. Acc. Ins. Co.,* 655 A.2d 936, 938 (N.J. Super. Ct. App. Div. 1995). Only one of those residences, by definition, can be "primary." *See, e.g., Bolin v. Progressive Nw. Ins. Co.,* No. 07-49, 2009 WL 1010770, at *8 (E.D. Mo. Apr. 9, 2009) ("While a person may reside in two places for purposes of insurance coverage, a person cannot reside 'primarily' in two places."); *Kline v. State Farm Mut. Auto. Ins. Co.,* No. 07-904, 2008 WL 11337667, at *3 (D.N.M. Nov. 24, 2008)

(concluding "that the phrase 'resides primarily' is not ambiguous and that one can have only one primary residence at any given time").

With these definitions in mind, the Court finds that the Policy term "primary residence" is unambiguous as a matter of law and refers to the main, principal place where the insured lives—that is, the main, principal place where the insured maintains a physical presence as an inhabitant. *See State Farm Fire & Cas. Co. v. Lange*, 480 F. App'x 309, 314 (5th Cir. 2012) ("The term 'primary residence' is unambiguous and it means one's principal, chief, or most important residence."). In even simpler terms, it is where the insured mainly physically resides.

## B. Whether Metius Used the Vessel as His Primary Residence

Having interpreted the meaning of "primary residence," the Court's next step is to determine whether the undisputed material facts establish that Metius used the Vessel as his primary residence. Although Metius testified that he considered the Blairstown Address to be his primary and only residence, this conclusion lacks support in the record and, in accordance with the analysis articulated below, is not dispositive of the present issue.[3] *See* Metius Dep. Tr. 65:1-65:6.

Only one New Jersey court has undertaken a "primary residence" analysis within the context of an insurance coverage dispute. *See Ivanovs v. Waechter*, No. ATL-L-2146-17, 2020 WL 8362084, (N.J. Super. Ct. Law Div. Feb. 27, 2020). In *Ivanovs*, the parties were in an automobile accident and the plaintiffs sought to recover under the defendant's mother's automobile insurance policy by arguing that the defendant "primarily resided" at his mother's address. *Id.* at *1-2. When the plaintiffs moved for summary judgment, the state court, faced with an issue of first impression, took guidance from two factually similar cases from the Southern and Western Districts of Texas: *State Farm Fire & Cas. Co. v. Lange*, No. H-09-2011, 2011 WL 149482, (S.D. Tex. Jan. 18, 2011), *aff'd*, 480 F. App'x 309 (5th Cir. 2012), and *State Farm Fire & Cas. Co. v. Neuman*, 186 F. Supp. 3d 643 (2016). *Id.* at *5. The state court considered and applied *Neuman*'s non-exhaustive list of factors to determine the defendant's primary residence. *Id.* at *5-6. The factors include how often a person stays at a residence; how transient he is; how long he has resided in a residence; where he keeps his belongings; whether he lists a residence on important

---

[3] The Court makes two notes in regard to this finding. First, Metius personally understood the term primary residence to mean "[i]f a person had no other house and lived in an apartment, lived on a boat, lived in a castle, and had no other dwelling, I would consider that a primary residence." Metius Dep. Tr. 104:24-105:2. Second, Metius's arguments that Progressive's own designees admitted that Blairstown—not the Vessel—was Metius's primary residence is unpersuasive. *See* Def. Opp'n Br. at 13. The Court reviewed the designees' deposition transcripts to which Defendant cites, and the line of questioning asks about possibilities and situations that could be true as to Metius's use of the Vessel, while otherwise omitting the nuanced facts of this case and Metius's own representations to Progressive when he made the claim. *See* Noble Dep. Tr. 112:3-112:13, 115:13-115:22; Stern Dep. Tr. 49:13-51:7, 54:25-55:13.

9

documents; whether he owns or rents; whether he shares a residence with others; and the subjective views of the person and other people living in his residences.[4] *Neuman*, 186 F. Supp. 3d at 654. "While no one factor is dispositive, '[w]here a person spends the majority of his time is the most important factor.'" *Id.* (quoting *Lange*, 2011 WL 149482, at *5). "Therefore, an individual's 'primary residence will generally be the dwelling in which he spends the majority of his time.'" *Ivanovs*, 2020 WL 8362084, at *6 (quoting *Neuman*, 186 F. Supp. 3d at 654). The state court in *Ivanovs* ultimately concluded, based on the totality of the circumstances, that there was a genuine dispute as to where the defendant spent the majority of his time, and therefore denied the plaintiffs' motion for summary judgment.[5] *Id.* at *5-6.

*Ivanovs*' totality-of-the-circumstances approach is consistent with the way district courts in the Third Circuit make residency determinations under state law analogous to New Jersey's—by looking at the pattern of contact that a person has with a particular residence. *See GEICO Cas. Co. v. Alicea*, 416 F. Supp. 3d 425, 433 (W.D. Pa. 2019); *Chong Chen v. Allstate Ins. Co.*, No. 11-2356, 2012 WL 460416, (E.D. Pa. Feb. 14, 2012). Because of the focus on factual physical presence, these courts have found a person's own identification of the place he or she calls "home" or "residence" is not determinative. *Chong Chen*, 2012 WL 460416, at *6 (quoting *Allstate Ins. Co. v. Naskidashvili*, No. 07-4282, 2009 WL 399793, at *3 (E.D. Pa. Feb. 16, 2009)) (quotation marks omitted); *see also Alicea*, 416 F. Supp. 3d at 433; *but see Neuman*, 186 F. Supp. 3d at 654 (identifying "the subjective views of the person and the other people living in his residence" as a relevant, but not dispositive, factor). Instead, the relevant considerations are objective ones, and are essentially the same as the *Neuman* factors: where the individual eats, sleeps, stores personal items, and receives mail; the frequency and nature of the individual's presence at the residence; and the address used on documents such as a driver's licenses, tax returns, and other records. *Alicea*, 416 F. Supp. 3d at 433; *Chong Chen*, 2012 WL 460416, at *6. Based on these considerations, courts look for "at the minimum, some measure of permanency or habitual repetition" as to the person's physical presence. *Chong Chen*, 2012 WL 460416, at *6 (quotation marks and citation omitted). Accordingly, "when a person actually lives in one location, and sporadically visits, or keeps certain personal items at, another location, it is the location where he lives that is his residence." *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 560 (3d Cir. 2008) (applying Pennsylvania law).

---

[4] Additional factors articulated in *Neuman*, but which are not relevant to the present case, include: whether he has plans, or will be required, to vacate a residence; whether he contributes to maintenance, upkeep, property taxes, or other costs; whether blood or legal relationships exist between him and others living in either residence; whether he has full and free access to a residence and its contents. 186 F. Supp. 3d at 654.

[5] That the state court could not "determine, with any level of specificity, where [the defendant] spent the majority of his time" appears, in large part, to be due to the fact that "most of his deposition testimony was riddled with vague generalities regarding where he actually lived, when and with whom." *Ivanovs*, 2020 WL 8362084, at *6.

This Court follows *Ivanovs'* totality-of-the-circumstances approach to the issue of primary residence here, and considers the following factors relevant to the present action: the frequency and nature of Metius's stays on the Vessel; the place he keeps his belongings; the place he receives mail; and the address he lists on important documents.

The record reflects that once Metius separated from his wife in August of 2016 and moved out of their home in Jersey City, he needed to find somewhere else to live. He rented an apartment in Jersey City from November of 2016 through August of 2017, during which time he looked for a boat to buy. In July of 2017, Metius purchased the Vessel and procured a slip for it at the Marina with the express intent to live aboard it throughout the year because it was close to his office in Jersey City and he could avoid the commute that he would otherwise have to make from the Blairstown Address. Once he took possession of the Vessel in August of 2017, he terminated his Jersey City apartment lease that same month because he had the Vessel to live on. It was an affirmative step in establishing a new residence in Jersey City.

The record further reflects that in the 149-day period Metius had the Vessel—from August 1, 2017, to the date of the fire on December 28, 2017—he stayed aboard the Vessel 59 nights, stayed at the Blairstown Address 33 nights, stayed at Ms. Latour's Jersey City apartment 23 nights, and stayed at other locations (while travelling) 34 nights. Def. Resp. to Pl. SOMF ¶¶ 33, 41; Metius Decl. ¶ 14, ECF No. 50-8. Considering the Vessel and the Blairstown Address to each be a residence at which Metius physically lived, and considering Ms. Latour's apartment and the other locations he stayed at while travelling to be places he simply visited, it is clear Metius spent double the amount of time at the Vessel (59 nights) than he did at the Blairstown Address (33 nights). Each month, he stayed aboard the Vessel more nights than he stayed at the Blairstown Address. *See* Metius Decl. ¶ 14, ECF No. 50-8. In August, he stayed 9 nights on the Vessel and 2 nights at the Blairstown Address; in September, 15 nights on the Vessel and 11 nights at the Blairstown Address; in October, 15 nights on the Vessel and 8 nights at the Blairstown Address; in November, 11 nights on the Vessel and 9 nights at the Blairstown Address; and in December, 9 nights on the Vessel and 3 nights at the Blairstown Address. *Id.*

As to the nature of his stay aboard the Vessel, Metius testified that it was to be his base in Jersey City so he could avoid the commute from Blairstown. Metius Dep. Tr. 42:16-42:18. He arranged for cable and internet to be supplied to the Vessel because he does work from home and needed to connect to the office. *Id.* 43:17-43:20. He testified that "when you say you leave the office, I say I'm going home," it was the Vessel that he was referring to and returning to as his home. *Id.* 91:21-91:23. He also testified that as a result of the fire, "I had no home. I had lost my day-to-day clothing, my work clothing, my ID." *Id.* 91:20-91:21. Metius submitted a declaration, attached as an exhibit to his brief in opposition to the motion for summary judgment, that attempts to undermine his prior representations and testimony that the destruction of the Vessel left him essentially

11

homeless.   Without explaining the discrepancies, his declaration states that the only personal items he routinely had on the Vessel was a travel bag, and that he kept his physical belongings, personal and important documents, and most of his clothes at the Blairstown Address.  Metius Decl. ¶¶ 11-12, ECF No. 50-8.   Generally, "[w]hen a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007).  The Court is not so inclined to disregard Metius's declaration outright, but will consider that he kept personal belongings at both the Vessel and the Blairstown Address.

As to the nature of his stays at the Blairstown Address, Metius testified that it was his "*second* home," just as he described to Progressive that it was his "weekend home." Metius Dep. Tr. 91:11-91:13 (emphasis added); Pl. Ex. 2, Jan. 9, 2018 Phone Tr. 38:3-38:4, 38:19-38:21, ECF No. 49-3.  He testified, "[I]t's my practice to go to the lake house every weekend to do my washing and so forth. . . . But it's my practice, has been for many years and continues to be to spend the weekends and any weekdays I can scrounge out up at Blairstown." Metius Dep. Tr. 65:17-66:2.  This pattern of travel is consistent with the testimony of Metius's daughter-in-law, Ashley Metius, who testified that Metius's time spent at the Blairstown Address "was usually on the weekends, and then . . . occasionally during the week as well." Ashley Metius Dep. Tr. 25:4-25:8.  It is also consistent with Ms. Latour's testimony that she and Metius stayed at the Blairstown Address on certain weekends, from Friday to Sunday, in September, October, November, and December. Latour Dep. Tr. 21:10-21:11, 21:16-21:17, 21:25-22:1, 22:8-22:9.  Coupled with the fact that Metius spent double the time at the Vessel (59 nights) than at the Blairstown Address (33 nights), his testimony describing how he used the Blairstown Address and his pattern of travel to and from suggests he used it as a weekend home, or second home, and not as the place where he mainly physically resided.

Lastly, as to Metius's mailing address(es), he receives bills and other mail at both the Blairstown Address and his Office Address, although this is contrary to his initial representation to Progressive that he does not have correspondence mailed to the Blairstown Address. Def. SOMF ¶ 19.  After Metius separated from his wife and moved out of their home in Jersey City, he listed the Blairstown Address on his license and car registration, his matrimonial settlement agreement, his personal income taxes, and certain business filings with the Secretary of State. Def. SOMF ¶¶ 14-19.  But he listed his Office Address as his physical or mailing address on the Marina's Dockage Agreement, the Vessel's Bill of Sale, the Certificate of Documentation issued by the National Vessel Documentation Center, and the Insurance Policy at issue. Pl. Ex. 3, ECF No. 49-4; Pl. Ex. 5, 49-6; Pl. Ex. 6, 49-7; Ins. Policy, ECF No. 1-2.  He also provided his Office Address, not the Blairstown Address, to New Jersey State Police during their investigation of the fire. Metius Dep. Tr. Ex. 2, ECF No. 49-2.  He testified "it was just easier for me to direct

the things to [the Office Address] . . . where I knew I would be daily and pick up the mail and so forth." Metius Dep. Tr. 46:9-46:12.  Overall, Metius's mailing addresses are not particularly illuminating on the issue of his primary residence, as there was "no post facility at the Marina or anywhere in that vicinity" for Metius to receive mail at the Vessel. Pl. Ex. 2, Jan. 17, 2018 Phone Tr. 72:10-72:15, ECF No. 49-3.  At most, it reaffirms that Metius could count on being physically present in Jersey City, but not in Blairstown, on a daily, or at least a regular, basis.

The Court finds the facts, viewed holistically and considering the totality of the circumstances, sufficiently establish that Metius was using the Vessel as his primary residence at the time of the fire.  It was the main, principal place at which he physically lived; the place he returned to when he says he is going home.  He owned and sometimes stayed at the Blairstown Address, but his physical contacts with this residence are those of a weekend visitor at a second home.  Progressive therefore appropriately denied coverage of Metius's insurance claim under the Policy's primary residence exclusion.  Progressive was likewise within its right to void the Policy under the "Fraud or Misrepresentation provision" in "Part VIII—General Provisions."[6]  It is plain from Metius's testimony and his emails to procure a Marina slip that he intended to use the Vessel as a liveaboard and not *exclusively* for pleasure or recreation as he selected on the Insurance Application.  To that end, Metius incorrectly stated or represented a material fact about the risk being insured.  The Court will therefore grant Progressive's motion for summary judgment.  In turn, Metius's counterclaims seeking a declaration that Progressive wrongfully denied coverage and rescinded the Policy, as well as seeking damages for breach of contract and breach of the implied covenant of good faith and fair dealing, are moot.

## IV.   CONCLUSION

For the reasons stated above, Progressive's motion for summary judgment, ECF No. 49, is **GRANTED**.  An appropriate Order shall follow.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

Date:  January 25, 2022

---

[6] As neither party discussed whether the Policy is also void under the general maritime law doctrine of *uberimmae fidei*, the Court does not reach that issue here.

13